## THE UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| **MICHAELENE M. EXTER** | : |
| | : |
| **Plaintiff** | : |
| **v.** | :   **3:11-cv-1365** |
| | :   **(JUDGE MARIANI)** |
| **WILKES-BARRE HOSPITAL** | : |
| **COMPANY, LLC,** | : |
| | : |
| **Defendant.** | : |

## MEMORANDUM OPINION

### I. Introduction

Plaintiff Michaelene M. Exter ("Plaintiff" or "Exter") filed a six-count Second Amended

Complaint (Doc. 12) against Defendant Wilkes-Barre General Hospital Company, LLC

("Defendant" or "the Hospital") alleging interference (Count I) and retaliation (Count II) under

the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 *et seq.*,

discrimination (Count III) and retaliation (Count V) under the Americans with Disabilities Act

("ADA"), 42 U.S.C. § 12101, *et seq.*, and corresponding violations of the Pennsylvania

Human Relations Act ("PHRA") (Counts IV, VI), 43 PA. CONS. STAT. § 951, *et seq.*, for

discrimination and retaliation on the basis of disability. Presently before the Court is

Defendant's Motion for Summary Judgment (Doc. 27). For the reasons that follow, the

Court will deny Defendant's Motion.

## II. Statement of Undisputed Facts

On June 18, 2007, Melinda Torbik-Belleman ("Belleman"), Defendant's Administrative

Director of Nursing, hired Plaintiff, a Registered Nurse, as an Administrative Supervisor.

(Defendant's Statement of Undisputed Material Facts ("DSOF"), Doc. 28, at ¶¶ 2-3). As an

Administrative Supervisor, Exter's responsibilities included "ensuring that the Hospital's

staffing needs (particularly in nursing) are met; serving as a resource of patients, patient

care providers and staff; and communicating information regarding patient care issues as

necessary and appropriate." (Id. at ¶ 7).

On May 20, 2008, Belleman issued Exter her 2007 Annual Performance Review. (Id.

at ¶ 10; Def.'s Ex. E, Doc. 28-5). The Hospital's evaluations score employees on a scale of

one ("Unsatisfactory") to four ("Exceeds Expectations") based on thirty-four factors. (DSOF

at ¶ 11; Def.'s Ex. E). Plaintiff received a two rating ("Needs Improvement") in five

categories and a three rating ("Meets Expectations") in the rest of the categories. (Def.'s

Ex. E). Because Defendant asserts, as a primary basis for summary judgment, that its

reasons for disciplining, and eventually firing, Plaintiff are consistent with deficiencies it

identified in her 2007 Performance Review (Br. in Supp., Doc. 29, at 1), the Court reviews

this evaluation in some detail.

Of the five "needs improvement" ratings, two related to communication, two to

leadership and one to teamwork. (Def.'s Ex. E at 2-3). In each of these areas, Belleman

2

provided comments. (*Id.*). With regard to teamwork, she wrote, Exter "must be more proactive with staff members. If they have an issue or she anticipates an issue, she must go to the area and provide support and guidance to the staff. She must be visible and willing to cooperate with them for the good of the patient." (*Id.* at 2).

> Regarding communication, Belleman wrote, Plaintiff
>
> needs to listen carefully when receiving [a] report and then communicate [it] forward with the same information to assure that everyone is on the same page. Many times information is confused from one point to another because she does not ask questions or because she communicates to the wrong people (non-charge nurses) about unit activity. Michaelene needs to explain decisions to the staff members so that they may understand her rationale and communicate, as indicated, to the patients.

(*Id.* at 3).

In discussing leadership, Belleman wrote, Exter "needs to communicate more clearly with her peers during report and with the staff members when making rounds to assure that everyone is on the same page in making decisions regarding patient movement and care." (*Id.* at 4).

On February 6, 2009, Exter requested intermittent FMLA leave. (Def.'s Ex. F, Doc. 28-6). Plaintiff's request form indicates that she had "been treated for [a] major depressive disorder." (*Id.*). Belleman approved Exter's request for intermittent leave on February 16, 2009. (DSOF at ¶ 25). "Between February 19, 2009 and April 28, 2009, Ms. Exter

3

requested, and received, four days of leave which she attributed to her intermittent FMLA."

(*Id.* at ¶ 30).

On April 28, 2009, Belleman issued Exter a Written Reprimand in accordance with

the Hospital's Progressive Discipline program.  (*Id.* at ¶ 49; Def.'s Exs. M, N, Docs. 28-13,

28-14).  The Reprimand lists "[i]nability to perform to hospital/system standards" as the

"reason(s) for conference."  (Def.'s Ex. N).  In the "documentation" portion of the Reprimand,

Belleman wrote,

> Michaelene has made multiple errors in cancelling staff according to the
> policy/bargaining unit contract.  She has not adjusted staffing for census
> fluctuations.  She has not documented consistently when she receives call-
> offs or cancellations from staff, leaving the next shift unaware of the staffing
> changes.   Michaelene has been ill-prepared when contacting the Clinical
> Directors and Administrators-on-Call.  She was unsure of how to convert to
> the manual process during a computer system down time and did not access
> the down time procedures to be a resources [sic] for the staff members.  She
> was not aware of what systems were actually down before notifying the
> Administrator-on-Call.

(*Id.*).

In addition to the Written Reprimand, Belleman also gave Exter an Improvement

Action Plan ("IAP").  (Def.'s Ex. P, Doc. 28-16).  The IAP reflected the issues discussed in

the Written Reprimand and included a "plan" for each "problem" identified.  (*Id.*).  Following

the Written Reprimand and the IAP, Belleman produced weekly IAPs between April 28, 2009

and May 19, 2009.  (*Id.*; Def.'s Ex. Q, Doc. 28-17).

4

"On May 20, 2009, Ms. Exter received her performance evaluation for 2008-2009."

(DSOF at ¶ 64; Def.'s Ex. R, Doc. 28-18).  The 2008-2009 Performance Review was "more

critical of her performance than" the 2007 Review.  (Pl.'s Counterstatement of Facts

("PSOF"), Doc. 37, at ¶ 65).

On June 9, 2009, "Jill Tupper ['Tupper'], a RN at the Hospital who was, at the time, a

patient in the Pediatrics Unit (where she was assigned due to a bed shortage) had filed an

'Incident Report/Complaint' against Ms. Exter."  (DSOF at ¶ 70; Def.'s Ex. S, Doc. 28-19).

According to the Incident Report, Tupper alleged that Exter violated the Hospital's "Core

Values" by being "rude and condescending."  (Def.'s Ex. S).  Specifically, Tupper alleged,

> [A]t 10:15 p.m. on June 8, Ms. Tupper called Debbie Harter (a nurse on the
> Pediatrics Unit) to obtain the in-house phone number to call off of her shift for
> the following day (since Ms. Tupper was an in-patient at the time). Ms. Harter
> advised Ms. Tupper that Ms. Exter was on the floor at the time and that she
> would just relay to her that Ms. Tupper would be unable to work the next day.
> Ms. Exter, however, told Ms. Harter to tell Ms. Tupper that she needed to call
> the nursing office and that she (Ms. Exter) would "be back in the office in 15 to
> 20 minutes."

(DSOF at ¶ 72).

Following the Incident Report, "Ms. Belleman, with the assistance of Lisa Goble

['Goble'], then Director Human Resources Information Systems and Payroll, investigated

Ms. Tupper's complaint[.]"  (Id. at ¶ 73 (internal citation omitted)).  On the basis of their

investigation, Belleman and Goble determined that Exter had violated the Hospital's Core

Values, "a Group II/III violation in the Hospital's Progressive Discipline program." (*Id.* at ¶¶ 80-81).[1]

On June 18, 2009, "Exter was advised that a patient with a perforated viscous (in the abdominal area) would be finished in surgery/recovery and would need an in-patient bed." (*Id.* at ¶ 82). "Such a patient would routinely be placed in the Surgical Intensive Care Unit (SICU). However, there were no beds in SICU at that time." (*Id.* at ¶ 83). "Ms. Exter made the decision to assign the patient a bed in the Cardiac Care Unit (CCU) and concurrently decided to reassign a nurse from SICU to CCU to care for the patient (while switching a CCU to SICU to ensure proper staffing)." (*Id.* at ¶ 84).

"This matter first came to Ms. Belleman's attention when she received an e-mail from the President of the nurses' union, Fran Prushinski, an RN working on the CCU on the evening of June 18." (*Id.* at ¶ 93; Def.'s Ex. X, Doc. 28-24). "Ms. Prushinski stated to Ms. Belleman that Ms. Exter's decision 'insulted the entire CCU 11-7 staff,' leading them to conclude that Ms. Exter did not believe them to be 'capable of taking care of a [H]artman[n]'s procedure [patient who] was in recovery when we came in.' Ms. Prushinski . . . stated that she was 'personally offended because an RN in CCU . . . stated that [he] would take th[e] patient.'" (DSOF at ¶ 94).

---

[1] While Plaintiff disputes Paragraphs 73, 80 and 81 of Defendant's Statement of Undisputed Material Facts, it does not appear that she disputes (1) that Belleman and Goble conducted an investigation, (2) that they determined Plaintiff violated the Hospital's Core Values and (3) such a violation constitutes a Group II/III violation under Hospital's Progressive Discipline program. (*See* PSOF at ¶¶ 73, 80-81).

"On June 19, . . . Ms. Belleman and Ms. Goble inquired about the nurse reassignment issue" and met with Exter. (*Id.* at ¶ 95). "Ms. Belleman and Ms. Goble told Ms. Exter at the conclusion of the meeting that she should contact them on Monday, June 22 and 'they would give [her] the decision, suspension versus termination.'" (*Id.* at ¶ 102). They determined that "Exter's decision-making process in reassigning the nurses on the night of June 18 warranted a Group II violation for '[i]nability to perform to standards.'" (*Id.* at ¶ 106). "The Hospital's Progressive Discipline program sets forth that three Group II violations in a 12 month period warrants discharge." (*Id.* at ¶ 109). Based on the "April 28, 2009 Written Reprimand for 'Inability to perform to Hospital/System standards,' the Jill Tupper/Core Values matter and the nurse-switching incident," Belleman and Goble decided to fire Exter. (*See id.* at ¶¶ 110-11; PSOF ¶ at 111).

"Exter submitted paperwork in support of her extended FMLA leave on June 24," which was subsequently approved (DSOF at ¶¶ 114-15). While Exter was on leave, Goble sent her a letter stating that she should report to Goble and Belleman upon her return. (Goble Dep., Def.'s Ex. T, Doc. 28-20, at 77:5-12). Plaintiff returned from FMLA leave on July 27, 2009. (DSOF at ¶ 116; PSOF at ¶ 116). Upon her return, Goble and Belleman terminated Exter's employment. (DSOF at ¶¶ 111, 116; PSOF at ¶¶ 111, 116).

7

## III. Summary Judgment Standard of Review

Through summary adjudication, the court may dispose of those claims that do not present a "genuine issue as to any material fact." FED. R. CIV. P. 56(a). Summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c); *Turner v. Schering-Plough Corp.,* 901 F.2d 335, 340 (3d Cir.1990). "As to materiality, . . . [o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).

The party moving for summary judgment bears the burden of showing the absence of a genuine issue as to any material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). Once such a showing has been made, the non-moving party must offer specific facts contradicting those averred by the movant to establish a genuine issue of material fact. *Lujan v. Nat'l Wildlife Fed'n,* 497 U.S. 871, 888, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990). "Inferences should be drawn in the light most favorable to the non-moving party, and where the non-moving party's evidence contradicts the movant's, then the non-movant's must be taken as true." *Big Apple BMW, Inc. v. BMW of N. Am., Inc.,* 974 F.2d 1358, 1363 (3d Cir.1992), *cert. denied* 507 U.S. 912, 113 S. Ct. 1262, 122 L. Ed.

8

2d 659 (1993). In employment discrimination cases, the Third Circuit Court of Appeals has stated that "[s]ummary judgment is to be used sparingly[.]" *Burlington v. News Corp.*, 759 F. Supp. 2d 580, 600 (E.D. Pa. 2010) (quoting *Doe v. C.A.R.S. Prot. Plus, Inc.*, 527 F.3d 358, 369 (3d Cir. 2008)).

## IV. Analysis

For the purposes of its Summary Judgment Motion, "the Hospital does not dispute that Plaintiff was eligible for FMLA leave and was a 'qualified individual with a disability' under the ADA." (Br. in Supp. at 4). Similarly, Defendant does not dispute Plaintiff can establish a *prima facie* case for Counts I, III, and IV. (*Id.*). However, the Hospital does contest whether Exter can set forth a *prima facie* claim of retaliation under the FMLA, ADA, or PHRA. (*Id.*). The essence of the Hospital's Summary Judgment Motion is that it fired Exter for reasons that were reflected in her 2007 Annual Performance Review which "criticized [her] for her lack of communication and teamwork long before she sought FMLA leave (or identified any alleged disability)[.]" (*Id.* at 1). Further, Defendant asserts, "the Hospital decided to terminate Plaintiff before she sought an extended FMLA leave." (*Id.*).

While all of Exter's claims are closely intertwined, their gravamen rests in FMLA retaliation, specifically retaliatory discharge. Her ADA claims likewise have their foundation in her discharge upon return from approved FMLA leave, which was granted for the medical condition that Plaintiff asserts constitutes her disability. Because the Hospital challenges

9

each of Exter's claims in the same manner, the same analysis applies to all of Exter's

claims. *See Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 301-02 (3d Cir.

2012) (noting that "[f]iring an employee for a valid request for FMLA leave may constitute

interference with the employee's FMLA rights as well as retaliation against the employee"

and discussing the overlap between FMLA retaliation analysis with employment

discrimination law) (quoting *Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir.

2009)); *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 306 (3d Cir. 1999) ("[A]nalysis of an

ADA claim applies equally to a PHRA claim.") (citing *Kelly v. Drexel Univ.*, 94 F.3d 102, 105

(3d Cir. 1996)).  For the sake of brevity, the Court shall only discuss Exter's FMLA

Retaliation claim.[2]

The FMLA provides up to twelve workweeks of unpaid leave during a twelve-month

period for certain family reasons and any serious health condition that makes the employee

unable to perform the functions of his position.  29 U.S.C. § 2612(a)(1).  When an employee

invokes her FMLA rights, an employer may not "discharge or in any other manner

discriminate against any individual for opposing any practice made unlawful" under the

FMLA.  29 U.S.C. § 2615(a)(2).  "To prevail on a retaliation claim under the FMLA, the

plaintiff must prove that (1) she invoked her right to FMLA-qualifying leave, (2) she suffered

---

[2] Beyond the well-stated claim of retaliatory and discriminatory discharge, it is unclear what type of ADA and PHRA claims Plaintiff brings in Counts III and IV of the Complaint.  Defendant characterizes these counts as hostile work environment claims and then asserts that Plaintiff has not adduced enough facts to make out such claims.  (Br. in Supp. at 19-21).  On review of the record evidence, the Court is of the view that the claims that are at issue are those that arise from Plaintiff's discharge on return from her FMLA approved leave.

an adverse employment decision, and (3) the adverse action was causally related to her

invocation of rights." *Lichtenstein*, 691 F.3d at 301-02. "[A]n employee does not need to

prove that invoking FMLA rights was the sole or most important factor upon which the

employer acted." *Id*. at 301.

Courts have borrowed from employment discrimination law to assess claims of FMLA

retaliation. Thus "claims based on circumstantial evidence have been assessed under the

burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

93 S. Ct. 1817, 36 L.Ed.2d 668 (1973), while claims based on direct evidence have been

assessed under the mixed-motive framework set forth in *Price Waterhouse v. Hopkins*, 490

U.S. 228, 276–77, 109 S. Ct. 1775, 104 L. Ed. 2d 268 (1989) (O'Connor, J., concurring)."

*Id*. at 302.[3]

> Under the *McDonnell Douglas* framework, [the employee] has the initial
> burden of establishing a *prima facie* case.   To do so, she must point to
> evidence in the record sufficient to create a genuine factual dispute about
> each of the three elements of her retaliation claim: (a) invocation of an FMLA
> right, (b) termination, and (c) causation.   If [the employee] can do so, the
> burden of production shifts to [the employer] to articulate some legitimate,
> nondiscriminatory reason for its decision.   If [the employer] meets this minimal
> burden, [the employee] must point to some evidence, direct or circumstantial,
> from which a factfinder could reasonably . . .   disbelieve [the employer's]
> articulated legitimate reasons.

*Id*. (internal citations and quotations omitted).

---

[3] The Court will analyze Plaintiff's retaliation claim under the *McDonnell Douglas* framework instead of
the *Price-Waterhouse framework*. *Lichtenstein*, 691 F.3d at 302 ("Although Lichtenstein calls on us to apply the
mixed-motive framework to her retaliation claim, she readily survives summary judgment under the more taxing
*McDonnell Douglas* standard.").

## A. *Prima Facie* Case

Here, it appears that Defendant only challenges the third element of Plaintiff's *prima facie* case. The Hospital argues, "[T]he fact that the termination decision preceded Plaintiff's FMLA request undermines the causal connection necessary to state a prima facie case." (Br. in Supp. at 16). "To demonstrate a *prima facie* case of causation, [an employee] must point to evidence sufficient to create an inference that a causative link exists between her FMLA leave and her termination." *Lichtenstein*, 691 F.3d at 307. "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Id.* (quoting *LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

Exter argues, "[T]he temporal proximity of her leave and her termination, alone, is sufficient evidence of discrimination to allow plaintiff to survive summary judgment." (Br. in Opp., Doc 36, at 4). According to Plaintiff, Defendant "decided to terminate Ms. Exter's employment while Ms. Exter was on FMLA leave." (*Id.* at 3). Exter submits that this is sufficient standing alone to create an inference of causality. (*Id.* at 4). The Court agrees. *See Lichtenstein*, 691 F.3d at 307 (finding that "the temporal proximity in this case is in the realm of what this Court and others have found sufficient at the *prima facie* stage" where the termination of the employee occurred "just seven days after she invoked her right to FMLA leave, and just three days after [she] returned from vacation") (internal quotation marks

12

omitted)).  *See also Keiderling v. RFM Servs., Inc.*, 3:12-CV-1972, 2014 WL 297522, at *8

(M.D. Pa. Jan. 27, 2014) (finding temporal proximity was unduly suggestive where the

employee "was fired the day after returning from his fourth consecutive absence from

work"); *Fuller v. AT&T*, CIV.A. 12-1001, 2014 WL 66019, at *9 (W.D. Pa. Jan. 8, 2014)

("Although the Third Circuit Court of Appeals has not recognized a bright line rule of what

constitutes sufficient temporal proximity, the law is clear that three days is in the realm of

what is considered sufficient at the *prima facie* stage.").

It is undisputed that Exter applied for extended FMLA leave on June 24, took FMLA

leave and that she was terminated upon her return on July 27, 2009.  (DSOF at ¶¶ 114-16;

PSOF at ¶¶ 114-16).  Since the Hospital terminated Exter's employment immediately

following her extended FMLA leave, it is reasonable to infer that Defendant decided to fire

her while she was on leave.  The Court has been offered no documentation to suggest

otherwise.  There has been no evidence submitted to suggest that the Hospital attempted to

communicate its decision to fire Exter before July 27—on June 22, on June 23 or during her

extended FMLA period.  It is undisputed that although Goble sent Exter a letter during her

FMLA leave, the letter made no mention of the Hospital's allegedly already rendered

decision to terminate her employment.  (Goble Dep. at 77:5-12, 79:9-14).

The only evidence Defendant offers to contest the reasonable inference that it

decided to fire Plaintiff during her FMLA leave is Goble's deposition testimony.  (Reply Br.,

13

Doc. 40, at 12). Goble testified that she and Belleman made the decision to fire Exter on June 22, 2009. (Goble Dep. at 78:15-24). The Hospital argues that Goble's deposition "is only evidence as to the date in the record on which the termination decision was made." (Reply Br., Doc. 40, at 12).

However, the Hospital's assertion ignores the reasonable inference discussed above. On a motion for summary judgment, the non-moving party is entitled to have all reasonable inferences drawn in its favor. *Big Apple BMW*, 974 F.2d at 1363. While Goble may reiterate her deposition testimony at trial, and attempt to convince a jury that the discharge decision was made on June 22, 2009, this presents a triable issue of fact that precludes summary judgment. Thus, an issue of material fact exists as to when the Hospital made Exter's discharge decision.[4]

---

[4] Defendant cites two unreported cases from the Eastern District of Pennsylvania to support its argument, *Reinhart v. Mineral Tech. Inc.*, CIV.A. 05-4203, 2006 WL 4050695 (E.D. Pa. Nov. 27, 2006) and *Burch v. WDAS AM/FM*, CIV.A. 00-4852, 2002 WL 1471703 (E.D. Pa. June 28, 2002). These cases are inapplicable. In *Reinhart* and *Burch*, there was clear, uncontested evidence that the discharge decision occurred before the plaintiffs requested or took FMLA leave. 2006 WL 4050695 at *3-*4, *13; 2002 WL 1471703 at *10.

In *Reinhart*, the plaintiff's direct supervisor contacted the defendant's Human Resources Manager to inform her of his decision to terminate the plaintiff. 2006 WL 4050695 at *3-*4. The Human Resources Manager then left the plaintiff a voicemail saying that he was to "consider himself 'on paid suspension until further notice.'" *Id.* at *3. Later that day, plaintiff's doctor contacted the defendant's human resources department requesting that the plaintiff be excused from work. *Id.* at *4. Similarly, in *Burch*, "the evidence that the decision to terminate [the] plaintiff was made before he requested or took leave [wa]s uncontroverted." 2002 WL 1471703 at *3. Moreover, *Burch*'s discharge involved undisputed, "perceived deficiencies long pre-dating his request for leave." *Id.* at *3 n.13.

Here, in contrast, there is a dispute as to whether Exter's discharge decision was made before or during her extended FMLA leave. *See D'Ambrosia v. Pennsylvania Chamber of Bus. & Indus.*, CIV.A 1:06-CV-2182, 2008 WL 4491945 at *7 (M.D. Pa. Sept. 30, 2008) (distinguishing *Reinhart* where the plaintiff raised "a genuine issue of material fact as to whether the decision to terminate his employment was made before he requested leave pursuant to the FMLA" and denying the defendant's summary motion on this basis). Unlike in *Reinhart*, the Hospital in no way communicated its decision to the Plaintiff prior to her request for leave. *See* 2006 WL 4050695 at *3-*4. Unlike in *Burch*, Plaintiff disputes the Hospital's position that its reasons for firing her represent perceived performance deficiencies that predated her initial request for intermittent FMLA leave. *See* 2002 WL 1471703 at *3 n.13.

## B. Legitimate Nondiscriminatory Reason

Since Plaintiff establishes a *prima facie* case of retaliatory discharge, the burden under *McDonnell Douglas* shifts to the Hospital to articulate a legitimate non-discriminatory basis for its decision to terminate Plaintiff's employment. *See Lichtenstein*, 691 F.3d at 302. "This burden is relatively light and is satisfied if the employer provides evidence, which, if true, would permit a conclusion that it took the adverse employment action for a non-discriminatory reason." *Burton v. Teleflex Inc.*, 707 F.3d 417, 426 (3d Cir. 2013) (citing *Tomasso v. Boeing Co.*, 445 F.3d 702, 706 (3d Cir. 2006) (internal quotation marks omitted)). "At this stage, 'the defendant need not prove that the articulated reason actually motivated its conduct.'" *Id.* (quoting *Shellenberger v. Summit Bancorp, Inc.*, 318 F.3d 183, 189 (3d Cir. 2003)).

Here, Defendant sets forth a legitimate non-discriminatory reason for firing Plaintiff. According to Defendant, it fired Plaintiff for the accumulation of three Group II violations. (*See* DSOF at ¶¶ 109-110). "The Hospital's Progressive Discipline program sets forth that three Group II violations in a 12 month period warrants discharge." (*Id.* at ¶ 109). "The three Group II violations considered were the April 28, 2009 Written Reprimand for 'Inability to perform to Hospital/System standards,' the Jill Tupper/Core Values matter and the nurse-switching incident." (*Id.* at ¶ 110).

15

## C. Pretext

Since Defendant establishes a legitimate non-discriminatory reason for firing Plaintiff, the burden of production shifts back to Plaintiff to demonstrate pretext. *See Lichtenstein*, 691 F.3d at 302. To demonstrate pretext, Plaintiff "'must point to some evidence, direct or circumstantial, from which a factfinder could reasonably . . . disbelieve [Defendant's] articulated legitimate reasons.'" *See id.* at 309-10 (quoting *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir.1994)). To do so, Plaintiff "must demonstrate such weaknesses, implausibilities, inconsistencies, incoherencies, or contradictions in [Defendant's] proffered legitimate reasons for its actions that a reasonable factfinder could rationally find them unworthy of credence." *See id.* at 310 (quoting *Fuentes*, 32 F.3d at 765).

Exter argues that her 2007 Annual Performance Review, issued prior to her request for FMLA leave, was largely positive. (PSOF at ¶ 10). Plaintiff points out that her overall evaluation (as well as her rating in twenty-nine of thirty-four factors) was a three out of four, or "'meets expectations', meaning 'Performance consistently meets expectations and objectives of position. Individual is a valuable contributor with opportunity for improvement/growth.'" (*Id.*). Although she received five "needs improvement" ratings, she was not rated "unsatisfactory" (a one rating) in any category. (*Id.*). Following her FMLA request, Plaintiff's 2008-2009 Performance Review was "more critical of her performance than her first evaluation." (*Id.* at ¶ 65).

16

Further, Plaintiff testified during her deposition that Belleman expressed "that she just d[id not] like FMLAs, basically because they cause of problems with call-offs." (Exter Dep., Pl.'s Ex. H, Doc. 37-8, at 181:3-7). Exter also testified that when Belleman would learn that a nurse used an FMLA leave, she would "get upset" and "leave the office in a huff." (Id. at 181:7-13). According to Plaintiff, "every time [Belleman] saw someone call off [for an FMLA leave] . . . , she would roll her eyes or, you know, make a disgusted face." (Id. at 187:12-15). Exter stated that Belleman "made specific remarks" about another nurse for "calling off a lot . . . about using her FMLA[.]" (Id. at 200:1-6).

After Plaintiff filed for FMLA, she testified that Belleman acted differently towards her. She stated, "The only thing I could say is when I did use my FML[A] time[,] the next day I went into work I . . . didn't feel welcome[.] . . . I felt like things were held against me." (Id. at 210:20-24). Exter explained that it was Belleman who made her feel unwelcomed. (Id. at 211:9-11). When asked what specifically Belleman did that made her feel unwelcomed, Plaintiff replied, she "[j]ust ignored me and then started the plan of action against me." (Id. at 211:12-16).

In response, Defendant asserts, as its primary basis for summary judgment, that it fired Plaintiff for deficiencies that predated her request for FMLA. (Br. in Supp. at 1). In the introduction to the Hospital's Brief in Support of Summary Judgment, it writes, "Plaintiff was criticized for her lack of communication and teamwork long before she sought FMLA leave

17

(or identified any alleged disability) and the events that led to her termination were manifestations of these long-standing deficiencies warranting the final step in her properly-applied progressive discipline." (*Id.*).

While it is true that her 2007 Performance Review generally states that Plaintiff needed improvement in the broad areas of teamwork, communication and leadership, the Review also isolated specific criticisms and goals. (Def.'s Ex. E). In essence, the 2007 Review contained two particular areas of concern. First, Belleman stated that Exter needed to be a better conduit for communications between her superiors and subordinates. The 2007 Review stated that Plaintiff needed "to assure that everyone is on the same page." (*Id.* at 3). As goals, the Review listed that Plaintiff needed "[t]o communicate clearly to staff and peers to assure that the proper messages are sent and the appropriate plan of care is followed" and "[t]o consistently communicate with the Clinical Directors and Clinical Leaders her observations of staff performance and any issues from her tour of duty." (*Id.* at 4-5).

The second area of concern related to being more "proactive with" and receptive to her staff. (*Id.* at 2). Another goal listed in the Review was for Exter "[t]o be more visible and cooperative with the staff members---to respond to patient issues and assist in the resolution of those issues." (*Id.* at 4).

18

Defendant asserts that these concerns, which predated her request for FMLA,

continued, as reflected in subsequent performance reviews and disciplinary actions. (Br. in

Supp. at 8-9). The Hospital states,

> In [the] April [Written Reprimand], Ms. Belleman's concern with Plaintiff's
> handling of the computer issue . . . was that she did not understand the
> problem, did not go to the source of the problem and, as such, was not able
> to articulate it clearly when she called (i.e., problem solving and
> communication). Similarly, Ms. Belleman's concern with the staffing issues
> raised in April . . . was that Plaintiff was not communicating clearly and was
> not familiar with the CBA (similar to her failure to listen carefully).
>
> The June issues are tied even more closely to the May 2008 concerns. That
> is, Plaintiff's refusal to go to Jill Tupper's room was a manifestation of Ms.
> Belleman's concern over Plaintiff's unwillingness to go to the source of a
> problem. The "nurse-switching" incident resulted from Plaintiff's failure to
> listen carefully to the instructions of the Clinical Director and her unwillingness
> to discuss the matter with her fellow Administrative Supervisor or others with
> greater, and more relevant, experience.

(*Id*. at 9 (internal citations omitted)).

The Hospital's characterization of these disciplinary actions takes liberties with the

similarities and ignores other aspects of the 2007 Review which are inconsistent with the

Hospital's subsequent criticisms. First, the stated rationale for reprimanding Plaintiff for the

Tupper incident was that she violated the Hospital's Core Values of compassion and

courtesy. (*See* DSOF at ¶ 80). However, the 2007 Review did not reflect deficiencies in

these areas. (Def.'s Ex. E at 2). Plaintiff received a three rating, or "meets expectations," in

each of the four subcategories under courtesy and compassion. (*Id*.). As a result, the

19

Hospital's stated rationale for disciplining Plaintiff for the Tupper incident is not consistent with her 2007 Performance Review.

Second, the Hospital stretches the 2007 Review to reflect its criticisms for the nurse-switching incident. According to Belleman and Goble, Exter deserved admonishment based on her "decision-making process in reassigning the nurses on the night of June 18[.]" (DSOF at ¶ 106). Belleman explained that she felt Exter failed to receive sufficient input from other Hospital employees before making her decision. (*Id.* at ¶ 107). The 2007 Review, in contrast, only tangentially related to a failure to receive sufficient input.

Although the Review indicated that Plaintiff "needed improvement" in "[p]rovid[ing] information and ask[ing] for suggestions from colleagues," it also stated she "met expectations" in

Listen[ing] to fully understand others before expressing [her] thoughts.

Ask[ing] questions to clarify and understand the position of others.

Talk[ing] through conflicting opinions with others without defensiveness.

Participat[ing] in cooperative problem solving efforts; request[ing] input of other and [being] open to suggestion.

(Def.'s Ex. E at 2, 3 (emphasis in original)).

The gist of the 2007 Review recommendations seems to indicate that Exter needed improvement in ensuring she understood the decisions from her superiors and in relaying such information accurately to her subordinates. (*Id.* at 2-4). The Court does not read the

20

2007 Review as criticizing her problem-solving ability or her willingness to receive input from others.  Thus, there are disputed issues of fact as to whether the Hospital's alleged justification for her reprimand following the nurse-switching incident reflects concerns raised in her 2007 Performance Review.

Third, the Court fails to see sufficient continuity between the 2007 Review and the April 28, 2009 Written Reprimand to find such continuity undisputed.  The Written Reprimand primarily referenced Exter's handling of a computer issue as well as alleged errors in "cancelling staff according to the policy/bargaining unit contract" and documenting "call-offs or cancellations from staff."  (Def.'s Ex. N).  Regarding the computer issue, "Belleman found Ms. Exter's decision-making and problem-solving skills deficient."  (DSOF at ¶¶ 37-38).  As stated, the 2007 Review indicated that Exter met expectations in problem solving (Def.'s Ex. E at 2).

Regarding the staffing issues, the Hospital argues that this portion of the Written Reprimand is similar to the 2007 Performance Review.  (Br. in Supp. at 9).  For summary judgment purposes, the Hospital's argument is not so clearly supported by the undisputed facts of record to preclude a triable claim of pretext.  Nowhere in the 2007 Performance Review is there any mention of problems "cancelling staff according to the policy/bargaining unit contract" or "not adjust[ing] staffing for census fluctuations" or "not document[ing] . . . call-offs or cancellations from staff," as discussed in the Written Reprimand.  (Def.'s Ex. N).

Therefore, it is not an undisputed fact that the Hospital's stated rationale for the Written Reprimand discusses concerns raised in her 2007 Performance Review.

Defendant also suggests that Plaintiff's handling of the computer issue reflected poor "communication skills . . . consistent with the issues raised in her previous [2007] evaluation particularly in relation to Ms. Exter's needing to be more proactive with staff members; going to the site of a problem; and communicating clearly." (DSOF at ¶ 38 (internal citation omitted)). Again, Defendant's attempt to demonstrate consistency overstates the similarities. Although the communication issues discussed in the Written Reprimand were the most similar to concerns raised in the 2007 Review, there is insufficient similarity for the Court to find that, as a matter of law, the Reprimand and the other alleged Group II violations are an extension of the performance issues isolated in the 2007 Review.

The Hospital cites *Shaner v. Synthes*, 204 F.3d 504 (3d Cir. 2000) and *Helfrich v. Lehigh Valley Hosp.*, CIV.A. 03-CV-05793, 2005 WL 670299 (E.D. Pa. Mar. 18, 2005) for the proposition "that post-complaint discipline that is consistent with pre-complaint issues is not pretextual as a matter of law." (Br. in Supp. at 10). However, these cases are distinguishable from the present matter. In *Helfrich*, the plaintiff "admitted [his supervisor] became very critical of his work performance prior to" requesting leave. 2005 WL 670299, at \*20. Here, in contrast, Exter does not admit that Belleman was critical of her work performance prior to her request for intermittent FMLA leave on February 6, 2009. (*See*

PSOF at ¶ 10; DSOF at ¶ 20).[5] Instead, Exter asserts that her 2007 Annual Performance Review was largely positive, indicating that her overall performance met expectations. (PSOF at ¶ 10; Def.'s Ex. E at 5).

In *Shaner*, the plaintiff received a "May 1993 performance evaluation—which Shaner himself viewed to be highly critical[.]" 204 F.3d at 504. The May 1993 evaluation "was given several months *before* he informed [his employer] about his disease and nearly a year before he filed his first EEOC charge." *Id.* (emphasis in original). In 1994, the plaintiff received another critical performance evaluation which "was a 'carbon copy' of the 1993 evaluation." *Id.* Here, Defendant's subsequent criticisms of Plaintiff's performance, though at best tenuously related to her 2007 Review, were far from "carbon copies" of the 2007 Review.

In sum, the Court does not find that the areas identified for improvement in the 2007 Performance Review are sufficiently similar to Defendant's criticisms after Plaintiff filed for FMLA leave to permit it to rule that, as a matter of law, no claim of pretext may be made at trial. Accordingly, the Court cannot hold that the 2007 Review erases any retaliatory inferences or entitles the Hospital to judgment as a matter of law. In light of Exter's assertions (1) that Belleman, who was her supervisor and who played a role in her

---

[5] Plaintiff does acknowledge that "Defendants had previously disciplined plaintiff for attendance issues" but points out that the Hospital did not list attendance problems as part of its reasons for her discharge. (PSOF at ¶ 10). Exter asserts that Belleman became more critical of her performance following her request for intermittent FMLA leave on February 6, 2009. (*Id.*; Def.'s Ex. F). On June 22, 2009, she applied for extended FMLA. (Def.'s Ex. Y). Both requests were for the same underlying condition, a "major depressive disorder." (Def.'s Exs. F, Y).

discharge, did not like FMLA, (2) that Belleman treated Plaintiff differently after she filed for

FMLA, (3) that Belleman evaluated Exter more critically after she filed for FMLA and (4) that

the Hospital decided to fire her during her extended FMLA leave; there is sufficient evidence

of pretext to avoid summary judgment. *See Fuentes*, 32 F.3d at 764; *Jalil v. Avdel Corp.*,

873 F.2d 701, 708 n.6 (3d Cir. 1989) ("[T]he *McDonnell-Douglas* formula does not

compartmentalize the evidence so as to limit its use to only one phase of the case. The

plaintiff's evidence might serve both to establish a *prima facie case* and discredit a

defendant's explanation.") (quoting *Dillon v. Coles*, 746 F.2d 998, 1003 (3d Cir. 1984)).

Because all of the Plaintiff's claims relate to the same alleged conduct and because

the Court's FMLA retaliation analysis is similarly applicable to Counts I, III-VI, the

Defendant's Motion for Summary Judgment will be denied in its entirety. *See Lichtenstein*,

691 F.3d at 301-02 (noting that "[f]iring an employee for a valid request for FMLA leave may

constitute interference with the employee's FMLA rights as well as retaliation against the

employee" and discussing the overlap between FMLA retaliation analysis with employment

discrimination law); *Taylor*, 184 F.3d at 306 ("[A]nalysis of an ADA claim applies equally to a

PHRA claim.") (citing *Kelly*, 94 F.3d at 105).

## V. Conclusion

For the foregoing reasons, the Court will deny Defendant's Motion for Summary

Judgment (Doc. 27). A separate Order follows.

24

Robert D. Mariani
United States District Judge